# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RYAN M. REDMOND,

        Plaintiff,

    v.                                 Case No. 12-CV-587

SIRIUS INTERNATIONAL INSURANCE CORPORATION,

        Defendant.

## DECISION AND ORDER

### I. PROCEDURAL HISTORY

Ryan M. Redmond ("Redmond") was seriously injured while skiing at Grand Teton National Park on July 2, 2011. When his health insurer, Sirius International Insurance Corporation ("Sirius"), denied coverage for his injuries, Redmond filed the present action, initially in Waukesha County Circuit Court. Sirius removed the action to federal court on June 8, 2012 based upon the diversity of the parties. On June 14, 2012, Sirius filed its answer and a counterclaim along with a motion to transfer the case to the Southern District of Indiana. Redmond responded to the motion and also filed motions asking that the court strike the defendant's answer and counterclaim and asking the court to require the defendant to post bond in accordance with Wisconsin law.

On August 7, 2012, the court denied the plaintiff's motions. With respect to Sirius' motion to transfer the action to the Southern District of Indiana, the court found that the record was insufficient to permit the court to resolve the motion and therefore held the motion in

abeyance as the parties engaged in discovery. On March 20, 2013, the court denied without prejudice the motion to transfer.

On September 9, 2013, the parties filed a total of eight separate motions. (Docket Nos. 54, 56, 58, 60, 63, 66, 70, 75.) The plaintiff subsequently filed two additional motions. (Docket Nos. 84, 107.) Of these 10 motions, the court must first address the defendant's renewed motion to transfer the case to Southern District of Indiana, (Docket No. 54), and thus decide whether this court or the Southern District of Indiana should resolve the 9 other motions.

## II. MOTION TO TRANSFER

The relevant policy contains a forum selection clause providing that venue for any action related to the policy shall be in "the Circuit and/or Superior Courts of Marion County [Indiana] and in the United States District Court for the Southern District of Indiana, Indianapolis Division (assuming that federal jurisdiction is otherwise appropriate and lawful)." (Docket No. 7 at 3-4.) If the forum selection clause is valid, pursuant to 28 U.S.C. § 1404(a), the "court should transfer the case unless extraordinary circumstances unrelated to the convenience of the parties clearly disfavor a transfer." Atl. Marine Constr. Co. v. United States Dist. Court, 517 U.S. ___, ___, 187 L. Ed. 2d 487, 494 (2013).

Wisconsin law bars such forum selection clauses in insurance policies. Wis. Stat. § 631.83(3)(b). But Wisconsin's prohibition applies to only "insurance policies and group certificates delivered or issued for delivery in this state, on property ordinarily located in this state, on persons residing in this state when the policy or group certificate is issued, or on business operations in this state." Wis. Stat. § 631.01(1). The defendant's argument against the application of this provision is limited to its view that Redmond was not "residing in" Wisconsin at the time the policy was issued. Sirius does not present, and therefore the court shall not

2

consider any other arguments that may be raised as to why this statutory proscription may be inapplicable to the present dispute.

As the court discussed at length in its prior order, Redmond v. Sirius Int'l Ins. Corp., 2012 U.S. Dist. LEXIS 110594 (E.D. Wis. Aug. 7, 2012), there is a dispute as to whether Redmond was "residing in" Wisconsin when the policy was issued. The court concluded that "residing in" "include[s] not only those who dwell within the state for a long-term or extended period of time, but also, to the extent that the categories are not redundant, those who have Wisconsin as their domicile, i.e. 'an individual's true, fixed, and permanent home where the individual intends to remain permanently and indefinitely and to which, whenever absent, the individual intends to return.'" Id. at 21 (quoting Wis. Stat. §§ 71.01(1n), 71.22(1t)).

Redmond traveled frequently. In fact, the insurance policy that is at issue here was designed specifically to serve the needs of such travelers. He lived in his mother's home in Delafield, Wisconsin until November 5, 2006 when he left for about six months of missionary work in Peru. He returned to Wisconsin and lived in Wisconsin until August 29, 2010, aside from a total of 30 days of missionary work in Peru and a month working on a Canadian dude ranch.

On August 25, 2010, from his home in Wisconsin, Redmond electronically submitted an application for renewal of his health insurance for the period of October 20, 2010 to October 20, 2011. (Docket No. 88, ¶8.) In doing so, he requested that the policy documents be sent to him in Vermont where he would be attending school. The application was approved the following day and the declaration and certificate were issued. (Docket No. 88, ¶9.) On August 29, 2010, Redmond left Wisconsin to travel to Vermont where he leased an apartment and attended school from August 30, 2010 through May 20, 2011, returning to Wisconsin in the interim for holidays.

(Docket No. 88, ¶¶11-12.) Following May 20, 2011, Redmond returned to Wisconsin. (Docket No. 88, ¶13.)

The court finds that notwithstanding his travels and attendance at school in Vermont, Wisconsin remained Redmond's domicile, and thus he was "residing in" Wisconsin when the policy was issued. This conclusion is further supported by the facts that Redmond filed taxes, had bank accounts, voted, and registered a vehicle in only Wisconsin. (Docket No. 88, ¶¶16-19.) Consequently, the policy's forum selection clause is unenforceable under Wis. Stat. § 631.83(3)(b).

Having concluded that the forum selection clause is invalid, the court must turn to Sirius' alternative argument and consider whether, after balancing all relevant factors, transfer to the Southern District of Indiana remains appropriate pursuant to 28 U.S.C. § 1404(a). "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

> Section 1404 (a) reflects an increased desire to have federal civil suits tried in the federal system at the place called for in the particular case by considerations of convenience and justice. Thus, as the Court recognized in <u>Continental Grain Co. v. Barge FBL-585</u>, 364 U.S. 19, 26, 27, [(1960)], the purpose of the section is to prevent the waste "of time, energy and money" and "to protect litigants, witnesses and the public against unnecessary inconvenience and expense.…"

<u>Van Dusen v. Barrack</u>, 376 U.S. 612, 616 (1964) (footnotes omitted). There is no dispute that this action could have been filed in the Southern District of Indiana. Thus, the court's analysis is limited to consideration of the convenience of the parties and witnesses and the interest of justice. The movant "has the burden of establishing, by reference to particular circumstances, that the transferee forum is clearly more convenient." <u>Coffey v. Van Dorn Iron Works</u>, 796 F.2d 217, 219-20 (7th Cir. 1986).

4

"With respect to the convenience evaluation, courts generally consider the availability of and access to witnesses, and each party's access to and distance from resources in each forum. Other related factors include the location of material events and the relative ease of access to sources of proof." Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d 973, 978 (7th Cir. 2010) (citations omitted). "The 'interest of justice' is a separate element of the transfer analysis that relates to the efficient administration of the court system." Id.

> For this element, courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy. The interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result.

Id. (citations omitted).

Neither forum is especially more convenient for the parties or witnesses. Of the witnesses identified by the parties as likely to testify at trial, four live in Wyoming, one lives in Colorado, two (or three using the defendant's count of potential witnesses) live in Indiana, one (the plaintiff) lives in Wisconsin (not Vermont as the defendant states), and one lives in Florida but maintains an apartment and office in Wisconsin. (Docket Nos. 87 at 15; 55 at 10.) The plaintiff's attorneys have offices in Milwaukee, Wisconsin; the defendant's attorneys are located in San Antonio, Texas, and are assisted by local counsel. Thus, a number of people are going to have to travel for trial. When traveling from Wyoming, Colorado, or Texas, it makes little difference whether the destination is Indianapolis or Milwaukee. The convenience of a trial in Indianapolis for the witnesses in Indiana would be countered by the inconvenience to the plaintiff, his attorneys, as well as his expert.

The defendant also notes that evidence, such as the plaintiff's insurance documents, is more likely to be found at offices in Indiana. (Docket No. 55 at 10.) The court finds that in the usual case, the location of documentary evidence is generally an inconsequential consideration. Routine discovery in any case will involve digitizing documents and thus whether parties are separated by city blocks or time zones, the means and ease of exchange will be the same. The court has no reason to believe this would not be the case here. And after all, discovery is complete so this truly is a non-issue.

The court also recognizes that, although it is unenforceable under Wisconsin law, the fact that the parties agreed to a forum selection may be given some weight in the analysis under § 1404(a). See IFC Credit Corp. v. Aliano Bros. Gen. Contrs., Inc., 437 F.3d 606, 608 (7th Cir. 2006) (citing Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 31 (1988). However, the fact of the parties' agreement is counterbalanced by Wisconsin's strong public policy against forum selection clauses in insurance contracts; thus, the interests of justice lead to the conclusion that this fact merits negligible weight. Cf. id.

With further respect to the interests of justice factor, the defendant points to the fact that the policy states, "Indiana law shall govern all rights and claims raised under this Certificate of Insurance." (Docket No. 55-1 at ¶6.) Whether Indiana law actually governs this case is the subject of a separate motion. (Docket No. 58.) As discussed below, the court finds that Indiana law does govern the interpretation of the present contract. Nonetheless, the court does not find that this factor is sufficient to overcome the presumption of preference for the plaintiff's chosen forum. Although a federal court in Indiana will naturally be more familiar with Indiana law, applying laws from other states is a routine task for federal courts. The defendant has not identified any reason for the court to believe that the legal questions in this action will involve

especially novel or complex interpretations of Indiana law such that there is a strong reason to have this matter overseen by a court with more intimate familiarity with Indiana law.

Therefore, having concluded that the forum selection clause is not enforceable and consideration of all the § 1404(a) factors fails to show that the Southern District of Indiana is clearly more convenient and/or favored as a result of a consideration of the interests of justice, the defendant's motion to transfer this action, (Docket No. 54), shall be denied.

### III. CHOICE OF LAW

The relevant insurance policy states, "Indiana law shall govern all rights and claims raised under this Certificate of Insurance." (Docket No. 55-1 at ¶6.) Relying upon this provision, the defendant asks the court to conclude that Indiana law applies to the claims raised in this case. (Docket Nos. 58, 59.) The plaintiff responds that Wisconsin law should apply because: (1) the defendant waived its opportunity to make a choice of law argument; (2) the choice of law provision is unconscionable; (3) the choice of law provision is contrary to Wisconsin public policy; (4) the choice of law provision would not apply to the plaintiff's bad faith claim; (5) a common law choice of law analysis indicates that Wisconsin law should govern. (Docket No. 86.) The defendant replies that a common law choice of law analysis would actually favor Indiana, but in any event, the choice of law provision remains enforceable, is applicable to all the plaintiff's claims, and the defendant did not waive the choice of law argument.

The court finds that Indiana law governs the present action. The court does not find that the defendant waived the choice of law argument. Choice of substantive law was not relevant to the court's prior decisions and concluding now that Indiana law applies does not require the court to reassess any prior conclusion.

Nor does the court find the relevant provision unconscionable. Even accepting the plaintiff's arguments that a reasonable person would not read the entire policy to recognize that it contained this choice of law provision, much less recognize its implications if he did, the court does not find the provision satisfies the high standard of unconscionability. The plaintiff does not point out what is supposedly so unfavorable about Indiana law that it would make it extremely unfair or oppressive to apply it in this case. If a reasonable person in the plaintiff's position had been fully aware of the presence and consequences of the choice of law clause, the court has no reason to believe he would not have still agreed to the insurance policy he was offered.

The court finds the plaintiff's argument that the choice of law provision violates Wisconsin public policy, (Docket No. 86 at 7-8), to be novel but misguided. In the plaintiff's view, only Wisconsin law could ever govern an insurance dispute involving a Wisconsin resident because Wisconsin's laws embody the public policy of the state and an insurance contract cannot ever be interpreted in a manner that offends the public policy of the state of Wisconsin. This argument is founded upon an overly-expansive reading of a quote of *Couch on Insurance* contained in Appleton Papers, Inc. v. Home Indem. Co., 2000 WI App 104, ¶44:

> A provision that a contract of insurance shall be governed by the law of a given state is void where such an express provision violates a statute of the state of the contract or would, if given force, evade statutory provisions declaring a rule of public policy with reference to contracts made within the jurisdiction, or where the contract stipulation would violate the interests and public policy of the state, since these cannot be changed by the contract of the parties.

What the Wisconsin Court of Appeals was actually saying in this quoted passage is that Wisconsin will not enforce a provision of an insurance contract that offends Wisconsin law simply because the contract contained a choice of law provision stating that the law of another state shall govern. It is for this reason that, notwithstanding the presence of the forum selection clause, it is appropriate to apply Wisconsin law to conclude that the forum selection clause was

8

invalid. The plaintiff does not point to any Wisconsin law or public policy similarly barring choice of law provisions in insurance contracts. The court rejects the plaintiff's argument that the court of appeals in <u>Appleton Papers</u> effectively found any choice of law provision unlawful.

Thus, the court turns to the plaintiff's remaining argument that Wisconsin law would still apply to his bad faith claim. (Docket No. 86 at 8-9.) In support of this argument, the plaintiff begins with the terms of the choice of law provision: "Indiana law shall govern all rights and claims raised under this Certificate of Insurance," (Docket No. 55-1 at ¶6). Redmond reads this provision as being limited to claims for insurance coverage. (Docket No. 86 at 8.) In Redmond's view, a claim of bad faith is not "raised under" the policy but rather is a wholly distinct claim.

The court disagrees. Although bad faith is a tort and is distinct from breach of contract, in this case, it is the existence of the contract that creates the relationship necessary for a bad faith claim. <u>Anderson v. Cont'l Ins. Co.</u>, 85 Wis. 2d 675, 687, 271 N.W.2d 368, 374 (1978) (the court looks to Wisconsin law here because that is the basis for the plaintiff's argument). If there was no contract, there could be no claim of bad faith. Any bad faith claim will depend upon the scope and provisions of the contract. Because a bad faith claim is inextricably linked to the contract, in the court's view, it is appropriately regarded as a "claim raised under this Certificate of Insurance."

Accordingly, the court concludes that the choice of law provision contained within the policy is enforceable and applies to all of the plaintiff's claims. Therefore, the defendant's motion, (Docket No. 58), shall be granted, and Indiana substantive law shall govern this matter. Consequently, the court shall not consider arguments presented by the plaintiff that are founded solely in Wisconsin law or otherwise unsupported by reference to Indiana law.

## IV. MOTIONS FOR SUMMARY JUDGMENT

Having concluded that Indiana law applies and this court must decide the present motions, the court turns to the parties' motions for summary judgment. Sirius seeks summary judgment in its favor on both Redmond's breach of contract, (Docket No. 70), and bad faith, (Docket No. 75), claims, as well as its cross-claim for breach of contract, (Docket No. 70), and with respect to the issue of future medical expenses, (Docket No. 66). Redmond seeks summary judgment on the question of coverage. (Docket No. 63.) The issues raised in all of the motions are largely inter-related and therefore the court shall address them together. At the core of the present dispute is the question of whether the relevant insurance policy afforded coverage for the injuries Redmond suffered and thus the court begins there.

### A. Facts

On July 2, 2011, 32-year-old Redmond joined three acquaintances on a trip to ski the Ellingwood Couloir, located in Grand Teton National Park in Wyoming. (Docket No. 83, ¶1.) All were experienced skiers and Redmond considered himself an "expert," having skied since age two and having skied competitively in high school. (Docket No. 83, ¶¶7-8.) Setting out at 1:00 or 2:00 AM, the group hiked up the mountain using crampons and ice axes to assist their assent. (Docket No. 83, ¶17-18.) Photographs of the group's ascent have been included in the record. (See Docket No. 68-5.) By about 10:00 AM, the group was about two-thirds of the way up the Ellingwood Couloir when they stopped to rest. (Docket No. 83, ¶19.) Two of the group, including Redmond, rested about 30 minutes, removed their climbing gear, and prepared for their descent; two others continued climbing, intending to reach the top of the couloir before skiing down. (Docket No. 83, ¶¶25-26.) Redmond was first to ski down the mountain but after skiing only a short distance, he lost his balance and fell. (Docket No. 83, ¶28.) When he ceased

tumbling down the mountain, he remained motionless, unconscious, and unresponsive. (Docket No. 83, ¶29.) He was eventually airlifted from the park for medical treatment. (Docket No. 83, ¶29.)

The relevant insurance policy that provided coverage for Redmond for the period of October 20, 2010 to October 20, 2011, contains the following exclusions:

> All charges, costs, expenses and/or claims (collectively "Charges") incurred by the Insured Person and directly or indirectly relating to or arising from or in connection with any of the following acts …:
>
> * * *
>
> (11) Charges incurred for any surgery, Treatment or supplies relating to, arising from or in connection with, for, or as a result of:
>
> * * *
>
> (d) **any Injury or Illness sustained while taking part in mountaineering activities where specialized climbing equipment, ropes or guides are normally or reasonably should have been used**, Amateur Athletics, Professional Athletics, aviation (except when traveling solely as a passenger in a commercial aircraft), hang gliding and parachuting, **snow skiing except for recreational downhill and/or cross country snow skiing (no cover provided whilst skiing in violation of applicable laws, rules or regulations; away from prepared and marked in-bound territories; and/or against the advice of the local ski school or local authoritative body)**, racing of any kind including by horse, motor vehicle (of any type) or motorcycle, spelunking, and subaqua pursuits involving underwater breathing apparatus (except as otherwise expressly set forth in Section Q. Recreational Underwater Activities). Practice or training in preparation for any excluded activity which results in injury will be considered as activity while taking part in such activity; and/or
>
> (e) any Illness or Injury sustained while participating in any sporting, recreational or adventure activity where such activity is undertaken against the advice or direction of any local authority or any qualified instructor or contrary to the rules, recommendations and procedures of a recognized governing body for the sport or activity….

11

(Docket No. 83, ¶33 (emphasis added).) Relying upon section (d) quoted above, Sirius denied Redmond's claim. (Docket No. 83, ¶¶36, 38.)

### B. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). A material fact is one that might affect the outcome of the case, and a nonmoving party's dispute is "genuine" only if a reasonable finder of fact could find in the nonmoving party's favor at trial. Anderson, 477 U.S. at 248-49. The court views the facts in the light most favorable to the non-moving party, and likewise it draws all inferences in the non-movant's favor. Ault v. Speicher, 634 F.3d 942, 945 (7th Cir. 2011). The court may not weigh the evidence or make credibility determinations. Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003). Thus, the nonmoving party will defeat a motion for summary judgment if it is able to produce admissible evidence that, when viewed in the most favorable light, would be sufficient to enable the finder of fact to return a verdict in its favor. Fleishman v. Cont'l Cas. Co., 698 F.3d 598, 603 (7th Cir. 2012).

### C. Analysis

"An insurance policy is a contract, and as such is subject to the same rules of construction as other contracts." Dunn v. Meridian Mut. Ins. Co., 836 N.E.2d 249, 251 (Ind. 2005) (citing Allstate Ins. Co. v. Dana Corp., 759 N.E.2d 1049, 1054 (Ind. 2001)). Because contract interpretation is primarily a question of law, it is a matter that is generally well-suited for summary judgment. FLM, LLC v. Cincinnati Ins. Co., 973 N.E.2d 1167, 1174 (Ind. Ct. App. 2012) (citing Mahan v. Am. Standard Ins. Co., 862 N.E.2d 669, 676 (Ind. Ct. App. 2007)).

"When interpreting an insurance contract courts must look at the contract as a whole." <u>Dunn</u>, 836 N.E.2d at 252 (citing <u>Meridian Mut. Ins. Co. v. Richie</u>, 540 N.E.2d 27, 29 (Ind. 1989)). In construing an insurance contract, the court should do "so as not to render any words, phrases, or terms ineffective or meaningless." <u>FLM</u>, 973 N.E.2d at 1174 (citing <u>Mahan</u>, 682 N.E.2d at 676). Terms should be given their plain and ordinary meaning. <u>Id.</u> (citing <u>Mahan</u>, 682 N.E.2d at 676). In determining the "plain and ordinary meaning" of a term, courts will frequently turn to dictionaries. <u>See, e.g.</u>, <u>Allgood v. Meridian Sec. Ins. Co.</u>, 836 N.E.2d 243, 247 (Ind. 2005); <u>State Farm Mut. Auto. Ins. Co. v. D'Angelo</u>, 875 N.E.2d 789, 797-98 (Ind. Ct. App. 2007).

However, if a provision of an insurance contract is ambiguous, it is to be construed strictly against the insurer. <u>FLM</u>, 973 N.E.2d at 1174 (quoting <u>Lake States Ins. Co. v. Tech Tools, Inc.</u>, 743 N.E.2d 314, 318 (Ind. Ct. App. 2001)). An insurance contract is not ambiguous simply because parties each have their own interpretation of a provision. <u>Id.</u> (citing <u>Mahan</u>, 682 N.E.2d at 676). Rather, "[a]n insurance contract is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning." <u>Id.</u> (quoting <u>Allstate Ins. Co. v. Bradtmueller</u>, 715 N.E.2d 993, 997 (Ind. Ct. App. 1999)).

### 1. Mountaineering Exclusion

In its motion for summary judgment, the defendant begins with the contention that the plaintiff's injuries directly or indirectly related to or arose from or were in connection with mountaineering activities "where specialized climbing equipment, ropes or guides are normally or reasonably should have been used." Mountaineering is not defined in the policy.

There is no dispute between the parties that when he was ascending the mountain, Redmond was mountaineering. But Redmond was not injured on his ascent, and the parties disagree as to whether his descent on skis constituted mountaineering.

The Oxford English Dictionary defines "mountaineering" as, "The action or sport of climbing mountains." Oxford English Dictionary, (January 15, 2014), http://www.oed.com/view/Entry/239554. Merriam-Webster similarly defines it as "the sport or technique of scaling mountains." Merriam-Webster, (January 15, 2014), http://www.merriam-webster.com/dictionary/mountaineering. The definition within the American Heritage Dictionary states, "The climbing of mountains, especially using special equipment and techniques on rock, ice, or snow. Also called mountain climbing." American Heritage Dictionary, (January 15, 2014), http://www.ahdictionary.com/word/search.html?q=mountaineering.

If a person uses the word "climb" or "climbing" in common conversation, the connotation will generally be of an action involving ascent, e.g. climb a ladder, climbing stairs, or climb a tree. This understanding is reflected in the Oxford English Dictionary's first definition of "climb," which states, "To raise oneself by grasping or clinging, or by the aid of hands and feet; 'to mount by means of some hold or footing' (Johnson); to creep up; to ascend, come, or go up, a perpendicular or steep place. Often with *up*." Oxford English Dictionary, (December 2, 2013), http://www.oed.com/view/Entry/34342 (emphasis in original).

But as any parent knows from having to frequently call after a rambunctious child, the word "climb" is often used alongside "down," to denote descent, as in, "Climb down from there before you get hurt!" The Oxford English Dictionary recognizes this usage of "climb" as its second definition of the word "climb" stating, "to descend by the same means." Oxford English Dictionary, (January 15, 2014), http://www.oed.com/view/Entry/34342.

Thus, if "mountaineering" is defined by reference to "climbing" and climbing can denote either ascent or descent, then necessarily, "mountaineering" must include both ascent and descent. The court finds this understanding of mountaineering to be the only logical definition.

14

After all, in the context of mountaineering, the proverb "What goes up, must come down," is generally literally true.

But a person is not necessarily "mountaineering" when he is descending a mountain simply because he ascended through mountaineering. A person who has helicopter waiting for him at a peak or who chooses to parasail off a mountain could not be appropriately regarding as "mountaineering" on his descent, notwithstanding the means of his ascent. Rather, as the Oxford English Dictionary notes in its second definition of "climb," when used in the context of descent, the action must be "by the same means." The court understands the "same means" to be referring to the means stated in the first definition of "climb," i.e. "grasping or clinging, or by the aid of hands and feet." Thus, whether ascending or descending a mountain by means of "grasping or clinging, or by the aid of hands and feet," the person is "mountaineering."

Here, Redmond generally hiked and climbed up and attempted to ski down. Obviously, skiing involves "the aid of hands and feet" but so do countless other obviously distinct activities. Common sense and common usage would not equate skiing with mountaineering; the actions are distinct in both connotation and denotation. Redmond engaged in mountaineering in order to go skiing but that predicate or the fact that the skiing occurred on a mountain (as skiing obviously often will) did not transform his skiing into mountaineering.

Nor does the court find persuasive the defendant's argument that the policy's expansive language barring coverage for injuries "arising from or in connection with, for, or as a result of … mountaineering" operates to bar coverage. Obviously, this provision serves a valuable purpose. Without it, perhaps a person who fell while mountaineering could argue that the mountaineering exclusion should not bar coverage because he was injured when he fell, not when he was mountaineering, which, by definition, would not include an uncontrolled fall. But

the defendant's argument stretches this provision too far. In the view of the defendant, because the causal chain the resulted in Redmond's injury included a mountaineering link, coverage must be barred. The court disagrees.

The court also rejects the defendant's contention that the mountaineering exclusion encompasses "ski mountaineering," which the defendant characterizes as a subset of mountaineering. The plaintiff contends that ski mountaineering requires ropes and other specialized equipment that he was not using on the descent, (Docket No. 64 at 23-24), but even accepting for present discussion that Redmond's acts fell within a broad definition of "ski mountaineering," the court finds that the mountaineering exclusion does not encompass the distinct activity of ski mountaineering. In describing the mountaineering exclusion, the policy states that mountaineering involves activities "where specialized climbing equipment, ropes or guides are normally or reasonably should have been used." Here, Redmond's downhill skiing would not have called for specialized climbing equipment, ropes, or guides, and thus, even if it came within a broad general definition of "ski mountaineering," the activity would not come within the policy's description of "mountaineering."

Therefore, the court concludes that the mountaineering exclusion does not apply in this case. Thus, the court turns to whether any of the policy's skiing exclusions apply.

## 2. Skiing Exclusions

In the portion of the insurance policy listing its exclusions, it also states:

"any Injury or Illness sustained while taking part in … snow skiing except for recreational downhill and/or cross country snow skiing (no cover provided whilst skiing in violation of applicable laws, rules or regulations; away from prepared and marked in-bound territories; and/or against the advice of the local ski school or local authoritative body)…."

16

This provision, moving back and forth between coverage and exclusions, is far from a model of clarity. It first excludes coverage for injuries sustained while snow skiing but then immediately excludes from the exclusion (and thus covers) injuries sustained while "recreational downhill and/or cross country snow skiing," and then adds a parenthetical to now exclude from the exclusion to the exclusion (and thus deny coverage for) injuries sustained while "skiing in violation of applicable laws, rules or regulations; away from prepared and marked in-bound territories; and/or against the advice of the local ski school or local authoritative body." The net effect of this provision is that injuries sustained as a result of recreational snow skiing are covered provided the skiing was not unlawful, against the advice of certain entities, or "away from prepared and marked in-bound territories."

The defendant argues that the plaintiff's skiing was not "recreational" and points to a case where a court found that a life insurance policy did not provide coverage for an insured who was killed in an avalanche while heli-skiing (traveling via helicopter to a remote location on a mountain and then skiing down the mountain) because, although the insured listed skiing as one of his "recreational activities" he did not disclose that he engaged in backcountry heli-skiing. (Docket No. 81 at 8-12 (discussing W. Coast Life Ins. Co. v. Hoar, 505 F. Supp. 2d 734 (D. Colo. 2007)).) However, Hoar is distinguishable in that the issue before that court was not whether a policy exclusion applied but rather whether the insurer had adequate notice of the risk it was undertaking when it relied upon his application to issue the policy. Moreover, the court's conclusion that the insurer was not adequately informed of its risk was not based solely upon the fact that the insured identified simply skiing, as opposed to heli-skiing, as a recreational activity, but also the fact that the insured did not disclose heli-skiing when asked if he engaged in "any hazardous activities." Id. at 744-49.

"Recreational" is not ambiguous. It is readily understood as, "An activity or pastime which is pursued for the pleasure or interest it provides." Oxford English Dictionary, (January 15, 2014), http://www.oed.com/view/Entry/159954. Thus, competitive or commercial skiing likely would not be covered under the policy. There is no evidence that Redmond was skiing for any purpose other than the pure pleasure or interest the sport provides, and thus the court concludes that Redmond's skiing on the day of his injury was recreational.

Nor is there reason to conclude that his skiing was unlawful or against the advice of any relevant entity. The next question is whether he was skiing "away from prepared and marked in-bound territories" when he was injured.

In Redmond's view, this phrase, when read alongside the other exclusions, means simply that there is no coverage if he is skiing in an area where he has been told not to ski. (Docket No. 64 at 27.) Thus, the exclusion would not apply here because he was skiing in an area where skiing was permitted; in effect, because skiing was permitted anywhere within Grand Teton National Park, the whole park was a prepared and in-bound territory. (Docket No. 64 at 27.)

Moreover, the term "away from" is ambiguous in the view of the plaintiff. It may be interpreted strictly to suggest the skier's direction. Thus, there would be no coverage if a skier started on a marked and prepared in-bound area but then left that area. Or, perhaps, there might be coverage for out-of-bounds skiing provided the skier's path, at some point, would intersect a marked and prepared in-bound territory and thus he was going towards, rather than away from, the in-bound territory. Therefore, a skier taking a shortcut through an out-of-bounds area would still be covered because he was going towards in-bound territory. Alternatively "away from" might be much broader, meaning generally, "outside," as in how one might say she is "away from home."

18

The court does not find the phrase "away from" to be ambiguous. Simply because a term has more than one denotation does not make it ambiguous; otherwise, the majority of words would probably be ambiguous. The differing understandings must also be reasonable given the context before the court will find a term ambiguous. The latter understanding, i.e. that "away from" means, roughly, "outside," is the only reasonable understanding of the term given the context in which it is used. There may be some arguable ambiguity as to how far from the prepared and in-bound territory a person must be to be "away from" such territory, e.g. whether the term should be read like the NFL rulebook where one foot on the line is out of bounds or if there might be a sort of "bubble" around a covered territory so that coverage does not necessarily end at a strict boundary line, see York v. Sterling Ins. Co., 114 A.D.2d 665, 666-67 (N.Y. App. Div. 3d Dep't 1985) (holding that policy provision excluding coverage for injuries "away from" the insured's property did not bar coverage for injuries sustained when a person riding a dirt bike on insured's property lost control, traveled over the insured's property line, and was injured). The follow-up question as to precisely how far one must be to be "away from" is not an issue presently before this court, although it may be relevant for trial. Thus, the court turns its focus to what is meant by "prepared and marked in-bound territories."

The court rejects the plaintiff's contention that the court must lump all the exclusions together and conclude that they mean simply that there is coverage so long as he was not skiing in an area where skiing was not banned. Such an interpretation offends the maxim of contract interpretation that, to the extent possible, every term and provision must be given meaning. In saying that there is no coverage if Redmond was skiing away from prepared and marked in-bound territories, this plainly encompasses more than simply skiing in an area where skiing is not barred. Thus, having concluded that "away from" means roughly "outside of," restating this

exclusion as a positive question, the issue before the court becomes, "Was Redmond skiing in a prepared and marked in-bound territory when he was injured?" Only if he was would the policy possibly afford coverage for his injures.

The plaintiff's focus upon "in-bound" overlooks two other essential components to the exclusion—"prepared" and "marked." The plaintiff refers to these terms in only a single inconsequential footnote, (Docket No. 64 at 31, n. 14).) If the plaintiff does not regard his argument on this point worthy of inclusion of the text of his brief, the court hardly regards it as worthy of much consideration; in fact, the court previously expressed its disapproval of the plaintiff's efforts to raise arguments in footnotes, (Docket No. 80 at 4).

The court agrees with the defendant that "prepared" and "marked" are words of ordinary use. However, this fact does not necessarily mean that the terms are unambiguous as used in the policy. The only argument offered by either party that approaches a definition of the term "prepared" is the defendant's suggestion that it means "groomed." (Docket Nos. 71 at 23; 103 at 3, 9.) As for "marked" there is only the defendant's footnote where it notes that Redmond testified he did not observe ropes, signs, fences, or other defined physical boundaries on the mountain that day. (Docket No. 71 at 21-22, fn.78.)

The court finds that both "prepared" and "marked" are subject to different interpretations. Again, simply because there are differing interpretations does not mean that the terms are ambiguous or that the policy affords coverage. Rather, for the term to be ambiguous, the differing interpretations must both be reasonable such that "intelligent persons would honestly differ as to its meaning." Stevenson by Freeman v. Hamilton Mut. Ins. Co., 672 N.E.2d 467, 471 (Ind. Ct. App. 1996) (citing Harden v. Monroe Guaranty Ins. Co., 626 N.E.2d 814, 817 (Ind. Ct.

App. 1993)). There is coverage only if one of those reasonable understandings is consistent with coverage. Thus, the court looks to the various meanings of these terms.

While "marked" is readily understood as having some sort of visible identification, see Oxford English Dictionary, (January 15, 2014), http://www.oed.com/view/Entry/114174, what is unclear is what sort of mark must be utilized or what these marks must indicate. The court presumes that if a ski area is bordered on the sides by signs and ropes demarcating the boundaries of the permissible skiing area, it is likely "marked" within the scope of the policy. But is this the only kind of identification that will render an area "marked?" What if the area is depicted on a map that includes boundary lines indicating the recommended areas for skiing? If markings on a map are sufficient, who must prepare such a map to render the area marked? Must the map be prepared by the entity in charge of the area, e.g. the National Park Service, or would a map prepared by a person with special knowledge of the area suffice? Or must the markings even relate to the in-bound territories? Would a sign in the vicinity of the mountain stating "Ski at your own risk," suffice as a marking? Perhaps there are many other plausible understandings of this term.

As for "prepared," again this term has a readily understandable common meaning, e.g. "To bring into a suitable condition for some future action or purpose; to make ready in advance; to fit out, equip." Oxford English Dictionary, (January 15, 2014), http://www.oed.com/view/Entry/150447. This definition is exceptionally broad and thus its application to the context of skiing is unclear. Even the defendant's own expert testified that he was not familiar with what this might mean in the context of skiing. (Docket No. 68-15 at 32.)

If ground has snow on it, to many persons, it is "prepared" for skiing in that it has been brought into a suitable condition for skiing, and thus the policy may be simply excluding

21

coverage when persons attempt to ski on surfaces not suitable for skiing. Or must there be some sort of human intervention? (<u>See</u> Docket No. 68-12 at 12.) If so, what sort of intervention? In the context of backcountry skiing, would inspection for or the mitigation of avalanche dangers be adequate preparation of the territory? If so, who must do this? Or must there be, as the defendant seems to suggest, formal grooming of the area, using, for example, a snow grooming machine? If the latter definition is appropriate, then would there be coverage under the policy if an insured was making a run after a fresh snowfall, or must he wait for the snow grooming machine to make a pass over the slopes?

The court finds that neither party has adequately articulated, much less supported, an appropriate conclusive meaning for these terms. While the defendant's understanding of the terms "prepared" and "marked" is, as discussed below in conjunction with the plaintiff's bad faith claim, reasonable, this understanding is not necessarily the only reasonable understanding. Therefore, because the court is not satisfied that the terms are unambiguous and support the conclusion that there is no coverage under the policy, the court cannot grant the defendant's motion for summary judgment. However, nor can the court grant the plaintiff's motion for summary judgment because the plaintiff has not adequately demonstrated that the terms are, in fact, ambiguous and/or support a finding of coverage. The plaintiff largely asks the court to read the terms out of the policy rather than presenting an alternative reasonable understanding of these terms that is consistent with coverage. Although the court offers here hypothetical interpretations of these terms to demonstrate how they terms are not necessarily un-ambiguous, absent the defendant's opportunity to respond to these interpretations, the court is not prepared to conclude that any of these proffered interpretations is reasonable. And in any event, even if reasonable, the

court could not conclude that the proffered interpretation would be consistent with coverage because the plaintiff has not presented any such factual support to the court.

Consequently, neither party has succeeded in establishing that summary judgment is warranted on their respective motions relating to coverage. Because the understanding of "in-bound" appears to be at least partially dependent upon the definitions of both "prepared" and "marked," the court finds itself similarly unable to fix a definition of this term at this time. Therefore, the parties' motions for summary judgment regarding coverage, (Docket Nos. 63, 70), shall be denied.

### 3. Future Medical Expenses

Based upon its reading of the plaintiff's complaint, the defendant understood that the plaintiff was seeking payment for medical expenses related to the accident but not incurred prior to the time the policy terminated. Thus, the defendant filed a motion seeking to foreclose this perceived request for damages. (Docket No. 66.) In response, the plaintiff states that he is seeking coverage only for medical expenses incurred between the date of the accident, July 2, 2011, and the date his coverage expired, October 19, 2012. The reference in the complaint to "costs of the medical care he will continue to receive in the future," (Docket No. 1-1 at ¶40), was not a demand for coverage beyond the policy period but rather was necessitated by the fact that the complaint was filed within the policy period. In reply, the defendant asks the court to strike the pertinent portion of the complaint and declare that future medical expenses are not available to the plaintiff.

The court finds that the defendant's motion, (Docket No. 66), is moot and therefore shall be denied as such. Further, the court finds no reason to strike any portion of the plaintiff's complaint. The parties agree that the plaintiff is not entitled to payment for medical expenses

incurred outside the policy period and the court does not read the complaint as seeking such damages. Thus, there is no controversy on this point that requires action by this court.

### 4. Bad Faith

It is well-established that insurers have a duty to deal in good faith with their insureds. Monroe Guar. Ins. Co. v. Magwerks Corp., 829 N.E.2d 968, 975 (Ind. 2005) (citing Freidline v. Shelby Ins. Co., 774 N.E.2d 37, 40 (Ind. 2002). "As a general proposition, '[a] finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will.'" Magwerks, 829 N.E.2d 968, 977 (Ind. 2005) (quoting Colley v. Indiana Farmers Mut. Ins. Group, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998)). This may be proven if the plaintiff can establish by clear and convincing evidence "that the insurer had knowledge that there was no legitimate basis for denying liability." Id. at 976 (quoting Freidline, 774 N.E.2d at 40). "Poor judgment or negligence do not amount to bad faith." Lumbermens Mut. Cas. Co. v. Combs, 873 N.E.2d 692, 714 (Ind. Ct. App. 2007) (quoting State Farm Mut. Auto Ins. Co. v. Gutierrez, 844 N.E.2d 572, 580 (Ind. Ct. App. 2006). Nor is the lack of a diligent investigation sufficient to support a finding of bad faith. Id. (quoting Gutierrez, 844 N.E.2d at 580). Thus, bad faith is not synonymous with a breach of contract. Even if a denial of coverage was improper, it was not necessarily done in bad faith. Id. (quoting Erie Ins. Co. v. Hickman, 622 N.E.2d 515 (Ind. 1993)).

Redmond's claim of bad faith is two-pronged. The first prong is Sirius' conduct before the suit was filed; the second is Sirius' conduct in defending this suit and pursuing a counterclaim against Redmond.

With respect to Sirius' pre-litigation conduct, Redmond contends that Sirius acted in bad faith when it failed to conduct an adequate investigation into his claim and denied his claim.

Sirius contends that its investigation was appropriate and its decision reasonable. In support, it points primarily to its "claim log," which it provided to the court, (Docket No. 73-24). However, absent appropriate foundation to establish that this document is a business record under Fed. R. Evid. 803(6), this document is inadmissible hearsay. The defendant fails to support this document by an affidavit or declaration, nor has the defendant directed the court to any relevant deposition testimony that could provide the necessary foundation.

The defendant also relies upon the deposition testimony of Tammie Peters ("Peters"), the person ultimately responsible for denying Redmond's claim. However, the defendant has provided the court with only nine pages of her 154 page deposition (three of the provided pages comprise the cover and certification pages), and not always the pages relied upon by the defendant, (see, e.g., Docket No. 73 at ¶130 (citing "Ex. W, Peters Dep. 10:7-9" which is not included in Docket No. 73-23).) In her deposition, Peters is asked to review Exhibit 11, (see Docket No. 68-10), which the questioner posits consists of articles found on the internet and placed in the claims file of Sirius' underwriter. (Docket No. 73-23 at 6.) At no point in the deposition excerpts provided to the court by the defendant does Peters authenticate these documents or testify that she relied solely upon them to make her coverage decision. Other documents attached to the defendant's proposed findings of fact and cited by defendant in its proposed findings of fact and in its briefs are similarly un-authenticated. The only other testimony in the portion of Peters' deposition provided to the court by the defendant that indicates the basis for Peters' decision to deny Redmond's claim is her statement that another employee offered his opinion that the claim was not covered because he reviewed an ambulance report and had done some internet research regarding where Redmond was skiing. (Docket No. 73-23 at 5.)

25

In contrast to the defendant's submissions, the plaintiff has provided the court with the entirety of Peters' deposition and thus the court turns to this document. (Docket No. 68-12.) Having reviewed this document, the court is able to fill in many of the gaps left by the defendant. In her deposition, Peters discusses Exhibit 7, which she describes as "insured notes" comprised of "notes that were put under the insured, Ryan Redmond." (Docket No. 68-12 at 15.) Exhibit 7, which was provided to the court by the plaintiff as Docket No. 68-7, is largely the same as the "claim log," (Docket No. 73-24), provided by the defendant, although the formatting of these documents differs and Docket No. 68-7 includes pages and entries beyond those included in the defendant's excerpt. Based upon this more complete review, the court concludes that Peters' testimony regarding this document is sufficient to bring the document within Fed. R. Evid. 803(6), and thus it may be appropriately considered by the court in deciding the present motion.

This document indicates that the decision to deny coverage was made by at least July 29, 2011. (Docket Nos. 73-24 at 3; 68-12 at 20.) The notes indicate that on July 5, 2011, the underwriter was informed that Redmond was in a "skiing accident with a head injury." (Docket No. 73-24 at 6.) An hour later, another employer of the underwriter spoke with personnel at the hospital and noted, "Admitted through ER / head trauma / fall from cliff." (Docket No. 73-24 at 5.) Ten days later, following a conversation with the helicopter ambulance service that assisted in Redmond's rescue, the notes state, "Appeared scene was Lupine Meadows, but was unsure if that is a ski resort or park." (Docket No. 73-24 at 4.) Later that day, a follow-up call confirmed that Lupine Meadows was in Grand Teton National Park. (Docket No. 73-24 at 4.) Four days thereafter, the underwriter communicated to the hospital that there might not be coverage because preliminary investigation indicated Redmond's "injuries were as a result of backcountry skiing." (Docket No. 73-24 at 4.)

The court is not able to find that the information contained in this document was necessarily sufficient to deny Redmond's claim. Thus, the court looks to what other information was available to the underwriter. Peters testified that she also relied upon a report from the helicopter ambulance service that transported Redmond. (Docket No. 68-12 at 20.) This report is included in Exhibit AA to Sirius' statement of proposed facts, (Docket No. 73-27 at 12-16), and, like many of the defendant's exhibits, is not authenticated by way of a declaration, affidavit, or deposition testimony. Nonetheless, the court shall consider it because the plaintiff does not dispute that this document is the Omniflight Helicopters-Idaho medical records received by the underwriter. (Docket No. 96, ¶107.) The portion of this report captioned "History of Present Illness" states, in part, "Pt had been backcountry skiing when he fell down steep slope approx. 800 ft. Took approx. 2 hrs before pt could be reached." (Docket No. 73-27 at 12.)

Taken together, all of this information provided a reasonable basis to deny Redmond's claim pursuant to the skiing exclusion in the policy. As discussed above, the terms "prepared" and "marked," as used within the skiing exclusion, can be reasonably understood in different ways. One such reasonable understanding would be the understanding that Peters testified she held, which there is no coverage for skiing outside of the boundaries of a ski run at a traditional ski resort. One could reasonably understand "backcountry skiing" to mean that Redmond was necessarily not skiing at a traditional ski resort. Subsequent information further corroborated the conclusion that Redmond was skiing in a remote wilderness area. (See Docket No. 73-14 (National Park Service Search & Rescue Report received by the underwriter on Sept. 15, 2011).) Thus, based upon the information provided, the decision to deny coverage was reasonable. This decision might prove incorrect, but it was not done in bad faith. There is simply no evidence that could permit a reasonable finder of fact to conclude by clear and convincing evidence that

Peters' decision to deny the claim was the result of a "dishonest purpose, moral obliquity, furtive design, or ill will."

Thus, the court turns to the question of whether Sirius' conduct in this litigation might form the basis for a claim of bad faith. Redmond argues that Sirius acted in bad faith by using tactics to try to get Redmond to concede Sirius' counterclaim, which Sirius eventually withdrew, and by failing to reconsider the denial of coverage after certain deposition testimony. (Docket No. 89 at 9.)

On the issue of post-litigation conduct vis-à-vis bad faith, courts across the country have been dealing with two distinct issues. The first is evidentiary: whether an insurer's conduct in litigation following the filing of a claim alleging bad faith might be used as evidence to support that claim of bad faith. The second is substantive: whether an insurer's conduct in litigation might itself form the basis for a claim of bad faith. The Court of Appeals of Indiana addressed these issues in Gooch v. State Farm Mut. Auto. Ins. Co., 712 N.E.2d 38 (Ind. Ct. App. 1999), and noted the general reluctance of courts to permit post-litigation conduct as evidence to support a prior claim of bad faith. Id. at 42 (discussing Howard v. State Farm Mut. Auto. Ins. Co., 316 S.C. 445, 450 S.E.2d 582 (1994); Palmer v. Farmers Ins. Exch., 261 Mont. 91, 861 P.2d 895 (1993); Nationwide Mut. Ins. Co. v. Clay, 525 So.2d 1339 (Ala.1987)). With respect to the second question, however, the Court of Appeals of Indiana concluded that when an insurer is sued, under certain circumstances, its post-litigation conduct might form an independent basis for a new bad faith claim.

In Gooch, the plaintiff sued her insurer seeking coverage under the uninsured motorist provision of her policy. After the action was filed, the defendant insurer insisted that she also pursue an action against another individual in a foreign jurisdiction, an action the plaintiff

believed would be frivolous. Believing that the insurance company was making these demands to frustrate her suit and thus pressure her to settle, the plaintiff amended her complaint to also allege bad faith. The court of appeals concluded that such litigation conduct by an insurer might present a cognizable claim of bad faith, and in doing so the court emphasized that the plaintiff was relying upon conduct that occurred only before she filed her bad faith claim.

What Redmond is attempting to allege here are two distinct bad faith claims. The first related to the denial of his claim; the second related to Sirius' conduct in the litigation. But as the court addressed in a prior order, (Docket No. 80), Redmond's complaint raises bad faith only with respect to Sirius' denial of his claim. Although Gooch involved a case initiated on a wholly distinct coverage claim, an insurer is likely not absolved of its duty of good faith simply because a plaintiff, like Redmond, initiates a suit alleging bad faith. If a suit is commenced containing a claim of bad faith and an insurer subsequently engages in litigation conduct that itself constitutes a distinct claim of bad faith, in accordance with Gooch, that plaintiff may amend her complaint to state a second distinct claim of bad faith.

Here, Redmond did not seek to amend his complaint to add a claim of post-litigation bad faith. Instead, he has attempted to expand the bad faith claim in his complaint by supplementing his discovery responses. The defendant objected and, as is fully discussed in this court's prior order, (Docket No. 80), the court rejected this means of constructively amending his complaint. There was no amended complaint and therefore no such claim of post-litigation bad faith is properly before the court. Thus, Redmond necessarily cannot obtain the relief he seeks. Accordingly, the court shall grant the defendant's motion for summary judgment as to the entirety of Redmond's bad faith claim.

### V.  MOTION TO STRIKE PLAINTIFF'S DEMAND FOR A JURY TRIAL

Alongside its choice of law and venue provisions, the insurance policy also states, "All trials regarding disputes under this insurance shall be exclusively presented to and determined solely by the court as the trier of fact, without a jury."

The plaintiff contends that this waiver of his right to a jury trial is unenforceable because it was not knowingly and intelligently made and the jury waiver provision is unconscionable. (Docket No. 95.) In reply, the defendant cites IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Un., 512 F.3d 989, 993-94 (7th Cir. 2008), for the proposition that a jury waiver provision need not be knowing, voluntary, or intentional to be enforceable. (Docket No. 102 at 2-3.) However, the contract at issue in IFC was a traditional commercial contract under the Uniform Commercial Code. Although insurance policies are a form of contract and traditional rules of contract interpretation are applied, there is a vast difference between a UCC agreement for the sale of goods and a consumer insurance policy.

In deciding whether a contract provision waiving the right to a jury trial is enforceable, the court looks to the state substantive law that governs the contract. IFC, 512 F.3d at 994. Thus, the court looks to Indiana law. The plaintiff cites only Wisconsin law; the defendant, although citing Indiana law, does not identify any Indiana case explicitly addressing the question of a jury trial waiver in an insurance contract. The court's own research has failed to identify any court that has applied Indiana law to directly answer this question.

Notwithstanding, the Court of Appeals for the Seventh Circuit noted that when it comes to the waiver of the right to a jury trial, an agreement to arbitrate a claim (and thus give up not only a jury trial but a judicial forum altogether) is arguably more onerous than an agreement to simply have a claim heard by a court instead of a jury, yet arbitration agreements are regularly

Case 2:12-cv-00587-AEG   Filed 01/15/14   Page 30 of 36   Document 110

enforced in all sorts of contracts without any special requirements. Id. Thus, in the absence of any case law addressing the validity of an insurance contract provision waiving simply the right to a jury trial, the court looks to how Indiana would regard a similar provision waiving the right to present a claim in any judicial forum.

Indiana law does not prohibit the use of arbitration provisions in insurance contracts, see Ind. Code sec. 34-57-2-1; rather, Indiana has a strong policy in favor of enforcing arbitration provisions in all contracts, including insurance contracts, see, e.g., Pekin Ins. Co. v. Hanquier, 984 N.E.2d 227, 228 (Ind. Ct. App. 2013); HemoCleanse, Inc. v. Phila. Indem. Ins. Co., 831 N.E.2d 259, 262 (Ind. Ct. App. 2005).

If an insurer can include in a standard insurance contract a provision whereby an insured will give up his right to not only a trial by jury but also the right to bring his action in any court, the court has little reason to conclude that a provision waiving the right to a jury trial is inherently unenforceable or any extraordinary means are necessary to render it effective. Thus, the court shall enforce the contract as written.

The plaintiff also raises separate arguments limited to the applicability of the waiver of the right to a jury trial to his bad faith claim. These arguments are basically a restatement of the arguments the plaintiff offered to support his contention that the choice of law provision did not apply to the bad faith claim. For the same reasons set forth above in the discussion of that motion, the court would reject these arguments. But more importantly, having concluded that the defendant is entitled to summary judgment on the plaintiff's bad faith claim, this aspect of the plaintiff's argument is moot.

Finally, the court rejects the plaintiff's argument that the defendant waived the opportunity to object to the plaintiff's demand for a jury trial. Under the circumstances of this

case, the court finds the present stage of litigation to be an appropriate time for the defendant to raise its objection. Therefore, the defendant's motion to strike the plaintiff's demand for a trial by jury, (Docket No. 50), shall be granted.

## VI. DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S EXPERT REPORT

The defendant objects to opinions offered by the plaintiff's expert, Daniel Doucette ("Doucette"), many of which are now moot in light of the court's decisions on other motions. Thus, having concluded that the defendant is entitled to summary judgment on the plaintiff's bad faith claim, Doucette's opinions on this topic are no longer relevant. The only topic on which Doucette opined that remains to be resolved is the question of what the phrase "away from prepared and marked in-bound territories" means.

On this topic, Doucette's conclusions read more like a legal brief than the opinions of an expert. (See Docket No. 61-1 at 19.) He does not opine as to how this phrase is commonly understood in the insurance industry, but rather offers general conclusions as to what this phrase might mean in the context of skiing. Although Redmond argues that Doucette is qualified to testify also as a ski expert, (Docket No. 91 at 9-10), the court is not persuaded. Doucette may be an experienced skier, but absent additional knowledge, skill, training, or education, the court finds that Doucette is not qualified to testify as an expert on skiing. The court is not going to open the witness stand to a parade of recreational skiers, each of whom would opine as to the meaning of the relevant phrase. An expert is supposed to assist the trier of fact and Doucette's opinion on these phrases is not at all helpful.

Therefore, to the extent that his opinions are not moot, the court shall grant the defendant's motion to exclude Doucette from testifying and strike his expert report, (Docket No. 60).

## VII.    MOTIONS TO STRIKE

Redmond moved to strike portions of the Sirius' brief in support of its motion for summary judgment on the plaintiff's bad faith claim, (Docket No. 84), and to strike Sirius's reply to its proposed findings of fact, (Docket No. 107.)

The first motion to strike, (Docket No. 84), relates to the fact that in its brief in support of its motion for summary judgment, Sirius relied upon an email exchange it had not previously disclosed in discovery on the grounds that it was privileged, (see Docket No. 76 at 9-10).   In response, Sirius apparently does not oppose the motion to strike, (Docket No. 97 at 4 ("Sirius will withdraw the previously withheld document at issue…"); its opposition is limited to the request for sanctions. Having considered the parties' briefs on the matter, the court does not find that sanctions are appropriate. Therefore, the motion to strike shall be granted; the request for sanctions shall be denied.

The second motion to strike relates to the fact that Sirius replied to Redmond's response to Sirius' proposed findings of fact. Responding to this motion, Sirius' counsel acknowledges that he misread what was permissible under the relevant local rule, Civ. L.R. 56(b)(3)(B), and agrees to withdraw the pleading. (Docket No. 109.) Therefore, the defendant having withdrawn the relevant pleading, (Docket No. 106), the motion to strike, (Docket No. 107), is moot.

## VIII.   CONCLUSION

Notwithstanding his travels, Redmond was "residing in" Wisconsin when he renewed his travel insurance policy with Sirius. Therefore, under Wis. Stat. § 631.83(3)(b), the policy's forum selection clause is unenforceable. Balancing all other relevant factors, the court does not find that transfer to the Southern District of Indiana pursuant to 28 U.S.C. § 1404(a) is appropriate. Therefore, Sirius' motion to transfer will be denied.

However, the choice of law provision within the contract shall be given its effect, and therefore Sirius' motion for an order holding that Indiana law applies to the present case will be granted.

As for the parties' motions for summary judgment, the court concludes that the mountaineering exclusion is unambiguous and does not exclude coverage for Redmond's injuries. As for the skiing exclusion, Redmond was engaged in recreational skiing, and there is no evidence that Redmond was skiing "in violation of applicable laws, rules or regulations … and/or against the advice of the local ski school or local authoritative body." However, the provision excluding coverage for skiing "away from prepared and marked in-bound territories" is subject to varying interpretations and the evidence before the court is insufficient to enable the court to conclude that either party is entitled to summary judgment on the question of whether the policy provides coverage for Redmond's injuries.

The court shall grant the defendant's motion for summary judgment with respect to the plaintiff's bad faith claim. The evidence is insufficient to permit a reasonable finder of fact to conclude that Sirius acted in bad faith in denying Redmond's claim. Moreover, Sirius' litigation conduct cannot form the basis for a bad faith claim because Redmond never amended his complaint to state such a claim.

The defendant's motion to strike the plaintiff's demand for a jury trial is granted in accordance with the plain language of the policy, and therefore in any trial in this matter, the court shall serve as the finder of fact.

The report of plaintiff's expert Daniel Doucette is largely moot in light of other conclusions by the court, but to the extent it is not moot, the defendant's motion to strike is granted. The plaintiff lacks the qualifications to testify as an expert on skiing and his opinions

regarding the meaning of the phrase "away from prepared and marked in-bound territories" are insufficiently supported to come within the appropriate ambit of an expert.

Finally, with respect to the plaintiff's motions to strike, the defendant concedes both. Therefore, the plaintiff's motion to strike portions of the defendant's brief in support of its motion for summary judgment is granted and its reply to the plaintiff's response to the defendant's proposed findings of fact is deemed withdrawn. The court declines to impose sanctions.

**IT IS THEREFORE ORDERED** that the defendant's motion to transfer this case to the United States District Court for the Southern District of Indiana, (Docket No. 54), is **denied**.

**IT IS FURTHER ORDERED** that the defendant's motion to strike the plaintiff's demand for a jury trial, (Docket No. 56), is **granted**.

**IT IS FURTHER ORDERED** that the defendant's motion for an order that Indiana law governs the plaintiff's claims, (Docket No. 58), is **granted**.

**IT IS FURTHER ORDERED** that the defendant's motion to exclude and strike the expert report of Daniel Doucette, (Docket No. 60), is **granted** to the extent that the motion is not moot.

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment on coverage, (Docket No. 63), is **denied**.

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment on future medical expenses, (Docket No. 66), is **denied as moot**.

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment on the plaintiff's breach of contract claim and the defendant's breach of contract counterclaim, (Docket No. 70), is **denied**

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment on the plaintiff's bad faith claim, (Docket No. 75), is **granted**.

**IT IS FURTHER ORDERED** that the plaintiff's expedited non-dispositive motion to strike, (Docket No. 84), is **granted**. **The request for sanctions is denied.**

**IT IS FURTHER ORDERED** that the plaintiff's expedited non-dispositive motion to strike, (Docket No. 107), is **denied as moot**. The defendant's reply, (Docket No. 106), is considered withdrawn.

**IT IS FURTHER ORDERED** that the court shall hold a telephonic conference on **January 28, 2014 at 9:00 AM (CST)** to discuss scheduling this matter for trial. The court will initiate the call. Not less than 48 hours before the call, counsel participating in the call shall provide to the court via email to GoodsteinPO@wied.uscourts.gov a direct telephone number where counsel may be reached for the call. The court strongly discourages the use of mobile phones for conference calls.

Dated at Milwaukee, Wisconsin this 15th day of January, 2014.


AARON E. GOODSTEIN
U.S. Magistrate Judge